Timothy J. Mulreany
**Maryland Bar No. 8812160123**
**COMMODITY FUTURES TRADING COMMISSION**
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
tmulreany@cftc.gov
(202) 418-5306

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | **Case No. 4:24-cv-5161** |
| **Plaintiff,** | **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** |
| **v.** | |
| **FRANCIER OBANDO PINILLO,** | |
| **Defendant.** | **JURY TRIAL DEMANDED** |

Plaintiff, Commodity Futures Trading Commission ("Commission" or "CFTC"), by and through its undersigned attorneys, hereby alleges as follows:

## I.     INTRODUCTION

1.     Beginning at least November 1, 2021 to December 31, 2023 (the "Relevant Period"), Francier Obando Pinillo ( "Defendant") individually and doing business as the sole proprietorships "Solanofi", "Solano Partners LTD" and

"Solano Capital Investments" (collectively "Solanofi Entities"), engaged in a fraudulent multilevel marketing ("MLM") scheme involving digital assets, using the website *www.solanofi.com* (the "website")*,* Facebook, YouTube, Telegram, "X," Instagram and other social media and in-person presentations to solicit not less than $5.9 million in digital and fiat (i.e., cash) assets from not fewer than 1,516 U.S. customers, including members of a Spanish-language church in Pasco, Washington, where Defendant was the pastor.  Defendant falsely claimed to trade digital assets, including Bitcoin ("BTC"), on behalf of customers.  At different times throughout the Relevant Period, Defendant falsely represented to customers that he operated a leveraged staking investment in digital assets.  Defendant later represented to customers that he was trading digital assets using customers' digital and fiat assets in an account at the bankrupt cryptocurrency exchange FTX Trading, Ltd. ("FTX").  Defendant, doing business as the Solanofi Entities, directed customers to transfer their digital and fiat assets into digital wallets and bank accounts controlled  by Defendant.  Defendant guaranteed customers profits of up to 34.9% per month by purportedly trading digital assets via the "Solanofi platform" which he claimed used a proprietary "bot" or software program controlled by the Defendant.  All of these representations by Defendant were false.

2.     Defendant utilized the Solanofi Entities to perpetuate the fraudulent scheme.  Defendant represented to actual and prospective customers that he was

the "CEO" of the Solanofi Entities, which were "dedicated to staking" and that customers who staked their digital assets with him earned "interest" on each transaction.  (Unless otherwise specified, all of Defendant's communications were in Spanish and translated herein using computer-assisted translation programs.) Defendant represented that trading on the Solanofi platform was "risk free." Defendant further represented that customers were guaranteed "profits" of up to 34.9% compounded monthly, depending on the number of months they "invested" with Defendant.  These representations by Defendant were false.

3.      In furtherance of the fraudulent scheme, Defendant provided customers with access to an online "dashboard" that displayed account statements showing their purported account balances, and from which customers could view their purported "profits." In order to encourage customers to involve friends and family in his fraudulent scheme, Defendant utilized an MLM component whereby he represented that he would pay a 15% "referral fee" to customers who referred additional customers.  These representations and account statements were false. During the Relevant Period, there was no trading platform, no trading took place, no profits were generated, and Defendant misappropriated all assets that customers transferred to Defendant.

4.      Along with his affirmative misrepresentations, Defendant made omissions of material facts in solicitations to actual and prospective customers,

including, but not limited to failing to disclose that: there was no leveraged staking

trading platform; no trading took place on behalf of or for the benefit of customers;

the online account statements were fabricated; the Solanofi Entities were sham

entities and their alleged profitability and trading track record were non-existent;

profits cannot be guaranteed in the commodity markets; Defendant

misappropriated all assets he received from customers; and, payments sent by

Pinillo to earlier-in-time customers in the form of sham "profits" and/or MLM

"referral" payments were actually misappropriated assets of later-in-time

customers in the nature of a "Ponzi" scheme.

5.      Defendant used the mails or instrumentalities of interstate commerce

in his solicitation of investors, including emails, text messages, and interstate wire

transfers.

6.      By virtue of this conduct and the conduct further described herein,

Defendant has engaged in acts and practices in violation of anti-fraud of Section

6(c)(1) of the Commodity Exchange Act ("Act"), 7 U.S.C. § 9(1), and Commission

Regulation ("Regulation") 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2023),

which makes it unlawful for any person, directly or indirectly, in connection with

any swap, or contract of sale of any commodity in interstate commerce, or contract

for future delivery on or subject to the rules of any registered entity, to

intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any

manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

7.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a1, the Commission brings this action to enjoin such acts and practices and compel compliance with the Act and Regulations.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

8.      Unless restrained and enjoined by this Court, Defendant is likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.      JURISDICTION AND VENUE

9.      This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by

act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that the CFTC may bring actions for injunctive relief or to enforce compliance with the Act or any rule, regulation, or order thereunder in the proper district court of the United States whenever it shall appear to the CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

10.    Venue lies properly with this Court pursuant to 7 U.S.C. § 13a-1(e) because Defendants resided and/or transacted business in this District, and certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District.

### III.    THE PARTIES AND OTHER RELEVANT ENTITIES

### A.    The Parties

11.    Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1-26, and the Regulations promulgated thereunder, 17 C.F.R. pts. 1–190 (2023).

12.    Defendant Francier Obando Pinillo, a resident of Pasco, Washington and Miami, Florida, is the self-described "CEO" of Solanofi.  Defendant is also the former pastor of Tiempo de Poder Church in Pasco, Washington.  Defendant has

never been registered with the Commission in any capacity.

**B.    The Solanofi Entities**

13.    Solanofi, Solano Capital Investments, and Solano Partners LTD are each sole proprietorships operated by Defendant.  None of the Solanofi Entities have been organized or operated pursuant to the laws of any jurisdiction and none have ever been registered with the Commission in any capacity.

## IV.    FACTS

**A.    Overview of Digital Assets and Leveraged Staking**

14.    A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights.  Digital assets include virtual currencies, such as BTC and similar commodities are digital representations of value that function as mediums of exchange, units of account, and/or stores of value.

15.    Certain digital assets, such as Tether ("USDT"), Ethereum ("ETH"), BTC, and Dogecoin ("Doge"), have been found to be "commodities" in interstate commerce,  as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

16.    Leveraged staking is a decentralized finance ("DeFi") strategy to maximize yield, whereby the holder of a digital asset loops their digital asset's liquidity through several protocols, staking their tokens to mint additional tokens or stablecoins, and then depositing it with a lending protocol to borrow more and repeat the process.

**B.     Defendant's Fraudulent Scheme**

17.     Throughout the Relevant Period, Defendant targeted unsophisticated customers who had little to no experience in digital asset transactions or commodity interest trading, and who were unfamiliar with how an investment in staking digital assets occurred.  Defendant's solicitations were almost exclusively in Spanish, which permitted him to abuse his position of trust as a pastor at a church in Pasco, Washington to attract customers who were congregants of that primarily Spanish-speaking church.

18.     In solicitations to actual and prospective customer written in Spanish, Defendant represented that he was the "CEO" of the Solanofi Entities and that "we are the developers of the Solano ecosystem" and that they were "dedicated to staking."  Defendant falsely claimed to trade digital assets, including BTC, ETH, USDT, and others, on behalf of customers.  At different times throughout the Relevant Period, Defendant falsely represented to customers that he operated a leveraged staking investment in digital assets.  Defendant later represented to customers that he was trading digital assets using customers' digital and fiat assets in an account at the bankrupt cryptocurrency exchange FTX.  Defendant, doing business as the Solanofi Entities, directed customers to transfer their digital and fiat assets into digital wallets and bank accounts controlled  by Defendant.  Defendant claimed to have an automated computer trading system which he called "Solanofi,"

and which he described as "a protocol designed for crypto specifically to fulfill exact functions."  Defendant claimed Solanofi rewards its users through an interest pool based on high performance [trading] of digital assets.

19.    Defendant later represented to actual and prospective customers that he had developed "Solanofi 2.0" and that Solanofi 2.0 is a trading protocol that simplified the safeguard process through cryptocurrencies: Bitcoin, Ethereum, Solana, USDT, Dogecoin and Shiba, for the staking function . Initially, Defendant offered "guaranteed" profits to customers, the amount of which depended on the amount of time customers "staked" their digital assets with  Defendant, generally three (3) to twenty-four (24) months.  Customers who chose the longest period, twenty-four (24) months, were guaranteed profits of 34.9% per month, compounded monthly.

20.    Defendant later changed the guaranteed "profits" - ranging between 10% compounded monthly to as high as 34.9% compounded monthly - depending upon the amount of assets "invested" with Defendant.  Defendant represented to actual and prospective customers: "Interest Generated, 10% Monthly from 1,000 to $4,999,  15% Monthly from 5,000 to $9,999, 20% Monthly from 10,000 to $19,999, 25% Monthly from 20,000 to $49,999, 30% Monthly from 50,000 to $299,999, 35% Monthly from 300,000 onwards." Defendant continued to offer actual and prospective customers "investment" periods of as little as three (3)

months, to as long as twenty-four (24) months.

21.    As part of the MLM solicitations, and in an effort to rapidly lure the largest number of customers into the fraudulent scheme in the shortest period of time, Defendant also offered customers a guaranteed "referral fee:"  "15% is a profit that is generated by your referrals, it will be available to be withdrawn to your destination wallet on Mondays. Every time your referral invests or reinvests you will win again that commission."  Defendant represented to customers that they would also earn "interest" on the referrals of potential customers to Defendant: "10% is a profit that is generated because of interest obtained by your referrals."

22.    All of these representations were false.  There was no automated computer trading program, there were no customer accounts, there was not trading taking place or profits generated, and Defendant was misappropriating all digital and fiat assets customers transferred to Defendant.

23.    Defendant omitted material facts in his solicitations to actual and prospective customers, including but not limited to: failing to advise customers he was misappropriating their assets; failing to advise customers there was no trading taking place; failing to advise customers there were no profits generated; failing to advise customers the online account statements were fabricated; and, failing to inform actual and prospective customers that it was not possible to guarantee

profits or mitigate the risk of trading in the constantly changing commodity markets.  Defendant further failed to advise actual and prospective customers that the guaranteed profits of 34.9%, compounded monthly – if true – would have yielded profits on a 24-month basis exceeding 400,000%, an impossibly high return on any investment.

24.     During the Relevant Period, Defendant used the mails, electronic mails, wire transfers, websites, and other means or instrumentalities of interstate commerce, to solicit customers and prospective customers and/or to accept or receive fiat and digital assets from customers.

25.     To conceal his fraudulent scheme, Defendant provided falsified online account statements to customers, which represented that Defendant was trading profitably and that their account balances were profitable and increasing monthly.

26.     Upon information and belief, there is no evidence that any of the digital assets Defendant received from customers were ever traded as intended or were used in any staking scheme.

27.     Defendant provided actual and prospective customers a promotional PDF presentation titled "Solano Fi" to entice them to invest in his fraudulent scheme.  Defendant's promotional PDF presentation to actual and prospective customers included a table showing, as an example, how much a $1,000 investment will grow to just under $1 million in a 24-month staking duration.

| | MES # | RESGUARDO | %MENSUAL | INTERESES MENSUALES |
|---|---|---|---|---|
| Año 1 | 1 | $ 1,000.00 | 34.9% | $ 349.00 |
| | 2 | $ 1,349.00 | 34.9% | $ 470.80 |
| | 3 | $ 1,819.80 | 34.9% | $ 635.11 |
| | 4 | $ 2,454.91 | 34.9% | $ 856.76 |
| | 5 | $ 3,311.68 | 34.9% | $ 1,155.77 |
| | 6 | $ 4,467.45 | 34.9% | $ 1,559.14 |
| | 7 | $ 6,026.59 | 34.9% | $ 2,103.28 |
| | 8 | $ 8,129.87 | 34.9% | $ 2,837.32 |
| | 9 | $ 10,967.20 | 34.9% | $ 3,827.55 |
| | 10 | $ 14,794.75 | 34.9% | $ 5,163.37 |
| | 11 | $ 19,958.11 | 34.9% | $ 6,965.38 |
| | 12 | $ 26,923.50 | 34.9% | $ 9,396.30 |
| Año 2 | 13 | $ 36,319.80 | 34.9% | $ 12,675.61 |
| | 14 | $ 48,995.40 | 34.9% | $ 17,099.40 |
| | 15 | $ 66,094.80 | 34.9% | $ 23,067.09 |
| | 16 | $ 89,161.89 | 34.9% | $ 31,117.50 |
| | 17 | $ 120,279.38 | 34.9% | $ 41,977.50 |
| | 18 | $ 162,256.89 | 34.9% | $ 56,627.65 |
| | 19 | $ 218,884.54 | 34.9% | $ 76,390.71 |
| | 20 | $ 295,275.25 | 34.9% | $ 103,051.06 |
| | 21 | $ 398,326.31 | 34.9% | $ 139,015.88 |
| | 22 | $ 537,342.19 | 34.9% | $ 187,532.43 |
| | 23 | $ 724,874.62 | 34.9% | $ 252,981.24 |
| | 24 | $ 977,855.86 | 34.9% | $ 341,271.69 |

28.    Throughout the Relevant Period, Defendant also misrepresented customers' purported account balances.  For example, Customer "SR's" online account balance stated that her approximately $36,000 initial investment in March 2022 had grown to over $1 million as of February 8, 2023.  Customer "SR" stated that she was able to log-in and see her purported balances up to as late as July/August 2023.

29.    In the latter part of the Relevant Period, Defendant continued his

fraudulent scheme by making new misrepresentations to attract additional assets from customers, including: the release of what he described in written solicitations as a purportedly "Christian-values" oriented token called the "ShekkelCoin;" a $1,500 maintenance fee to in order to access the Solanofi website, which had been cut off by Defendant; and, another $1,500 fee to support Solanofi's purported legal efforts to recoup assets from another bankrupt crypto-exchange that Defendant claimed had held a large amount of customers' assets.  All of these representations were false.

30.    As the pastor at his church in Pasco, WA, and as a guest speaker at other churches, Defendant was able to reach a vast number of potential customers, who believed he was honest and trust-worthy.  At one mega-church in Florida, Defendant lectured the congregants on the importance of lifting themselves out of poverty and then proceeded to pitch them on the 34.9%/month Solanofi trading scheme.  Defendant also promised Solanofi customers that they would be able to make withdrawals from their accounts after the 3-month period.

C.    **Misappropriation Via Customers' Digital Asset Transfers**

31.    In total, during the Relevant Period, Defendant solicited and accepted approximately $5.9 million from at least 1,516 U.S. customers to participate in the "Solanofi" trading program to trade digital assets, including SOL, in a fraudulent staking scheme.  Of the approximately $5.9 million in fiat and digital assets

Defendant received from customers, Defendant did not trade any assets on behalf of customers, but instead misappropriated them by transferring at least $4.05 million in digital assets to 23 private digital wallets in Colombia with no known connection to trading commodity interests.

32.     Defendant instructed customers to transfer their digital assets to private digital wallets he controlled.  Defendant also provided a bank name and account number to those customers who wished, or needed, to transfer fiat currency via traditional banking methods.   These included customers who may have not been financially sophisticated enough to use digital assets for these investments or those who transacted using regular banking services.

33.     For example, Defendant instructed customers to deposit their fiat currency to an account at Truist Bank, in an account carried in the name "Lady Consulting," account number xxxx9951.  During the Relevant Period, this account received over $218,000 just in cash deposits and transferred out over $215,000 to an entity in Colombia called "Inversiones Y Negocio Colombia."  An additional $77,000 was sent to other entities and individuals in Colombia or Colombian entities in the US.  None of these fiat assets were invested on behalf of customers, or sent to a commodity interest trading account.  All of these fiat assets were misappropriated by Defendant.

34.     Defendant created and controlled a number of private digital wallets

into which he directed customers transfer their digital assets during the Relevant Period. For example, Defendant directed Customer "A" to make transfers to the following private digital wallets, none of which are associated with commodity interest trading:

| Cryptocurrency | Address |
|---|---|
| BITCOIN | bc1qt* |
| ETHEREUM | 0x6CA* |
| TETHER | 0x6CA* |
| SHIB INU | 0x6CA* |
| SOLANA | DTkQt* |
| DOGECOIN | DU4dV* |

35.   The number of deposits made by known customers during the Relevant Period into each private digital wallet as directed by Defendant, and the corresponding dollar amounts of those deposits, is summarized in the following table:

| Wallet | # of Dep. | Dollar amount |
|---|---|---|
| bc1qt* | 2644 | $4,981,687.00 |
| DTkQt* | 358 | $430,787.00 |
| 0x6CA* | 128 | $422,699.00 |
| DU4dV* | 85 | $74,864.30 |
| TOTAL | | $5,910,037.30 |

None of these digital assets were sent to a commodity interest trading account. All of these digital assets were misappropriated by Defendant.

36.    In addition to directing customers to transfer their digital assets to private digital wallets, Defendant also directed customers to transfer their digital assets to various accounts held by individuals with no known connection to commodities trading carried at a major digital asset exchange ("Exchange A"). During the Relevant Period, $3,568,825.92 of the $4,981,687 in Bitcoin ("BTC") customers transferred to fund their purported trading accounts with Defendant were ultimately sent by Defendant to the following account holders at Exchange A:

|   | Wallet | Total | Account Holder |
|---|--------|-------|----------------|
| 1 | 14Mb6* | $117,783.41 | E.H. |
| 2 | 13AE1* | $751,472.00 | F.M. |
| 3 | 1CZTp* | $1,503,487.51 | Y.L. |
| 4 | 15wDC* | $1,055,208.00 | C.N. |
| 5 | 12bfs* | $140,875.00 | V.O. |

None of the individual account holders are registered with the Commission in any capacity. Upon information and belief, these individuals are associates of Defendant, and have no role in trading digital assets on behalf of customers.

37.    During the Relevant Period, $236,888.44 of the $422,699 in ETH, USDT and SHIB digital assets that customers transferred to fund their purported trading accounts with Defendant were ultimately sent by Defendant to the

following account holders at Exchange A:

|   | Wallet | Total | Account Holder |
|---|--------|-------|----------------|
| 6 | 0x834* | $101,230.39 | Y.L. |
| 7 | 0x2Ef* | $107,471.26 | F.M. |
| 8 | 0x027* | $4,945.89 | A.O. |
| 9 | 0x372* | $16,454.84 | C.N. |
| 10 | 0x150* | $780.73 | E.H. |
| 11 | 0x411* | $4,848.00 | E.H. |
| 12 | 0x886* | $105.89 | A.D. |
| 13 | 0xa09* | $1,051.43 | R.Y. |

None of these digital assets were sent to a commodity interest trading account carried in the name of customers.  Upon information and belief, these individuals are associates of Defendant, and have no role in trading digital assets on behalf of customers.

38.    During the Relevant Period, $200,828.07 of the $430,787 in SOL digital assets that customers transferred to fund their purported trading accounts with Defendant were ultimately sent by Defendant to the following private digital wallets/account holders at Exchange A:

|    | Wallet | Total | Account Holder |
|----|--------|-------|----------------|
| 14 | wepae* | $32,748.00 | C.N. |
| 15 | 276sF* | $38,615.55 | V.O. |
| 16 | 9j8KX* | $77,495.00 | F.M. |
| 17 | FafU7* | $46,993.00 | Y.L. |
| 18 | 6seqp* | $4,976.52 | E.H. |

None of these digital assets were sent to a commodity interest trading account, and all of the digital assets were misappropriated.  Upon information and belief, these individuals are associates of Defendant, and have no role in trading digital assets on behalf of customers.

39.    During the Relevant Period, $48,009.47 of the $74,864.30 in DOGE digital assets that customers transferred to fund their purported trading accounts with Defendant were ultimately sent by Defendant to the following wallets/account holders at Exchange A:

|     | Wallet | Total | Account Holder |
|-----|--------|-------|----------------|
| 19  | D7eeD* | $25,757.96 | F.M. |
| 20  | DJBE5* | $4,971.58 | A.O. |
| 21  | D8rmr* | $6,673.94 | C.N. |
| 22  | DFSZE* | $8,890.77 | V.O. |
| 23  | DK7uk* | $1,715.22 | E.H. |

None of these digital assets were sent to a commodity interest trading account. Upon information and belief, these individuals are associates of Defendant, and have no role in trading digital assets on behalf of customers.

D.    **Customer Requests for Redemptions**

40.    Defendant made false statements to customers regarding the withdrawal of assets from SolanoFi, and then failed to honor customers' withdrawal requests.  During the Relevant Period, customers who transferred assets to Defendant for a purported three (3) to twenty-four (24) month duration

staking investments were unable to withdraw all of their digital assets at the end of the staking period.

41.     When customers attempted to withdraw assets from their purported accounts, Defendant provided a series of excuses for not allowing them to withdraw their assets. For example, a post by Defendant released on the website on March 24, 2022, stated that there were technical issues with the SolanoFi dashboard.  Defendant's message added that even with the technical deficiencies, customers would continue to receive profits and interest on their investments.  All of these statements by Defendant were false.

42.     For example, another major digital asset exchange FTX became insolvent in late 2022 and entered bankruptcy.  In late 2023, Defendant represented to customers that that their assets were sent to FTX, their assets were frozen as a result of the FTX bankruptcy, and that was why he could not return customers' assets.  Another website post on October 13, 2023, represented that "SolanoFi's" attorneys were working with FTX to ensure a return customers' funds.  All of these representations were false.

43.     As described above, of the over $5.9 million of digital assets received at the digital wallets, over $4 million was transferred to other people's accounts at Exchange A, not at FTX.  There is nothing to indicate any customers' assets were ever transferred to FTX, or that Defendant or SolanoFi are creditors of FTX.

Tellingly, Defendant is not listed as a creditor in the FTX bankruptcy. Likewise, Solanofi, a sole proprietorship of Defendant, is not listed as a creditor in the FTX bankruptcy.

44.    Customers who spoke directly with Defendant were met with similar evasions and false statements. Customer B met with Defendant in person on October 7, 2022, at his church in Pasco, WA and begged for the return of her money. Defendant refused by saying he didn't have any money and that he was busy. To date, neither Customer B, nor any other customer, has yet to receive their requested funds.

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT ONE

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2023) (Fraud)**

45.    Paragraphs 1 through 44 are re-alleged and incorporated herein by reference.

46.    Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:

> [U]se or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity,

any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . .

47.    Regulation 180.1, 17 C.F.R. § 180.1(a), provides in relevant part:

It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:  (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or] (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

48.    By reason of the foregoing, during the Relevant Period, Defendant intentionally or recklessly, in connection with any swap, or contract of sale of a commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, directly or indirectly: used or employed, or attempted to use or employ, a scheme or artifice to defraud; made, or attempted to make, untrue or misleading statements of a material fact or omitted to state a material fact necessary in order to make the statements made not untrue or misleading; and/or engaged, or attempted to engage, in acts, practices, or courses of business that operated or would operate as a fraud or deceit on any person, including, but not limited to, Defendant customers as alleged herein.  Defendant falsely claimed to trade digital assets, including BTC, on behalf of customers.  At different times throughout the Relevant Period, Defendant falsely represented to

customers that he operated a leveraged staking investment in digital assets. Defendant later represented to customers that he was trading digital assets using customers' digital and fiat assets in an account at the bankrupt digital asset exchange FTX. Defendant, doing business as the Solanofi Entities, directed customers to transfer their digital and fiat assets into digital wallets and bank accounts controlled by Defendant

49.    By reason of the foregoing, Defendant violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

50.    Each and every use or employment or attempted use or employment of a scheme or artifice to defraud; or act of making or attempting to make untrue or misleading statements of a material fact or omitting to state a material fact necessary in order to make the statements not untrue or misleading; and act of engaging, or attempting to engage, in the acts, practices, or courses of business that operated or would have operated as a fraud or deceit on any person, including customers, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

## VI.    **RELIEF REQUESTED**

WHEREFORE, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A. An order finding that Defendant violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2023);

B. An order of permanent injunction enjoining Defendant, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2023);

C. An order of permanent injunction restraining and enjoining Defendant, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

    i. Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

    ii. Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2023)), or digital asset commodities (as that term is described herein), for their own personal account(s) or for any account in which the Defendant has a direct or indirect interest;

iii. Having any commodity interests or digital asset commodities traded on the Defendant's behalf;

iv. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital asset commodities;

v. Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interest or digital asset commodities;

vi. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2023); and/or

vii. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2023)), agent, or any other officer or employee of any person (as that term is defined in Section 1(a)(38) of the Act, 7 U.S.C. § 1a(38), registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9));

D. An order requiring Defendant to pay a civil monetary penalty of not more than the civil monetary penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2023), as amended 89 Fed. Reg. 4544 (Jan. 24, 2024), for each violation of the Act or Regulations, plus post-judgment interest;

E. An order directing Defendant, as well as any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, fees, or loans derived directly or indirectly from acts or practices which constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

F. An order directing Defendant, as well as any successors thereof, to make full restitution, pursuant to such procedure as the Court may order, to every customer and investor whose funds Defendant received, or caused another person or entity to receive, as a result of the acts and practices constituting violations of the Act and Regulations, as described herein,

and pre- and post-judgment interest thereon from the date of such

violations;

G.  An order directing Defendant, as well as any successors thereof, to

rescind, pursuant to such procedure as the Court may order, all contracts

and agreements, whether express or implied, entered into between, with,

or among Defendant and any customer or investor whose funds were

received by the Defendant as a result of the acts and practices which

constituted violations of the Act and the Regulations, as described herein;

H.  An order directing that Defendant, and any successors thereof, make an

accounting to the Court of all of their assets and liabilities, together with

all funds they received from and paid to investors and other persons in

connection with commodity transactions and all disbursements for any

purpose whatsoever of funds received from commodity transactions,

including salaries, commissions, interest, fees, loans, and other

disbursement of money or property of any kind from at least the

beginning of the Relevant Period to the date of such accounting;

I.  An order requiring Defendant and any successors thereof to pay costs and

fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

J.  An order providing such other and further relief as the Court deems

proper.

## VII.    <u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff hereby demands a jury trial.

Dated:  December 9, 2024

Respectfully submitted,

By: <u>/s/ Timothy J. Mulreany</u>
Timothy J. Mulreany
Chief Trial Attorney
 **Maryland Bar No. 8812160123**
tmulreany@cftc.gov

Karen Kenmotsu
Trial Attorney
**New York Bar No. 2599306**
kkenmotsu@cftc.gov

Paul G. Hayeck
Deputy Director
**Massachusetts Bar No. 554815**
phayeck@cftc.gov

**COMMODITY FUTURES TRADING COMMISSION**
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Telephone:  (202) 418-5306

Complaint -27